IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **SANDRA SCOTT, individually and as Independent Administratrix of the Estate of FLOYD T. SCOTT, deceased,** )<br>)<br>)<br>) | |
| **Plaintiff,** ) | |
| ) | |
| vs. ) | Case No. 20-cv-1287-DWD |
| ) | |
| **GLOBAL VASION, INC., AMAZON.COM, INC.,** )<br>) | |
| ) | |
| **Defendants.** ) | |

MEMORANDUM AND ORDER

**DUGAN, District Judge:**

Plaintiff Sandra Scott, individually, and as the Independent Administratrix of the Estate of Floyd T. Scott, brings this wrongful death and survival action against Defendants Global Vasion, Inc. and Amazon.com, Inc. related to the sale of electrically heated socks which she alleges caused the death of her spouse, Floyd Scott (Doc. 67). Plaintiff's claims against Defendant Amazon.com, Inc. have been resolved (Doc. 105), leaving only the claims against Defendant Global Vasion, Inc (hereinafter "Global Vasion"). Thes claims include:

- Strict Product Liability (Count I), Negligence (Count III), and Breach of Implied Warranty of Merchantability (Count V) brought pursuant to the Illinois Wrongful Death Act, 740 Ill. Comp. Stat. Ann. 180/1 et seq.;

- Strict Product Liability (Count II), Negligence (Count IV), and Breach of Implied Warranty of Merchantability (Count VI) brought pursuant to the Illinois Survival Act, 755 Ill. Comp. Stat. Ann. 5/27-6; and

1

- Violation of the Illinois Family Expense Statute, 750 Ill. Comp. Stat. Ann. 65/15, (Count VII).

(Doc. 65).[1]

On August 11, 2021, the Court granted Plaintiff's Motion for Default Judgment against Defendant Global Vasion on the issue of liability, but reserved for a hearing the issue of damages (Doc. 60). On November 28, 2023, the Court held an evidentiary hearing on the issue of damages pursuant to Fed. R. Civ. P. 55(b)(2)(B) (Doc. 104). Although proper notice was served upon Defendant Global Vasion, neither Global Vasion nor its counsel attended. After hearing evidence regarding Plaintiff's claims against Global Vasion and the resultant injuries, the Court took the matter under advisement to access the amount of damages, if any, Plaintiff should be awarded as part of the default judgment against Global Vasion.

## Factual Background

The following factual summary is comprised of information documented in the record as well as testimony and exhibits admitted during the damages hearing held on November 28, 2023. On December 13, 2018, Decedent Floyd T. Scott a/k/a Toby put on a pair of Defendant Global Vasion's "Electric Heated Socks with Rechargeable Battery for Chronically Cold Feet" (the "Product" or "Socks"). Toby's stepdaughter, Shana Anderson, had purchased the Socks on an Amazon website for Toby. The Socks were

---

[1]These Counts were all included in Plaintiff's original complaint (Doc. 1), which was the operative complaint at the time default judgment as to liability was entered against Defendant Global Vasion, Inc. (Doc. 60). The original complaint also included counts for violations of the Illinois Consumer Fraud Act brought against Defendant Global Vasion, Inc. pursuant to the Illinois Wrongful Death Act and Illinois Survival Act (Doc. 1, at Counts III and IV). However, those counts were dismissed (Doc. 60) and not revived in Plaintiff's Amended Complaint (Doc. 65).

2

marketed to consumers as safe and effective, and were advertised, packaged, and warranted as "good for blood circulation" and for people with "chronically cold feet", like Toby, who suffered from Type 2 diabetes with peripheral neuropathy. Toby's stepdaughter testified that this marketing influenced her decision to purchase Defendant's electric heated Socks.

Toby wore the Socks for approximately 3 hours before removing the batteries and placing them back on the charger. He continued to wear the socks without batteries until the following morning. When Toby removed the Socks, he discovered a large burn blister to his right heel which soon thereafter popped and opened into a large bloody wound, measuring approximately 10x8 centimeters. Toby was unable to feel the Socks burning his skin because of his diabetic neuropathy.

On or about December 15, 2018, Toby went to the emergency room at Washington County Hospital, where he was diagnosed with a second to third degree open burn wound to his right heel. Toby was referred to a wound care specialist for treatment. The wound care specialist performed multiple debridements of necrosing skin and prescribed oral antibiotics. Despite continued treatment, the wound continued to worsen in severity over the following weeks. On February 12, 2019, Toby was diagnosed with sepsis, gangrene, acute kidney injury due to underlying sepsis, tachycardia, and tachypnea, all noted to be secondary to his foot infection. Toby was then transferred via ambulance to Missouri Baptist Hospital, where he stayed for 10 days and further testing revealed that the infection had gone into his bone, with tunneling and skin breakdown spreading from

the heel wound up into his leg. The heel itself was mostly destroyed, and doctors stated that there was a high probability Toby would require amputation of the foot.

On February 22, 2019, Toby was discharged home with a PICC line for administration of IV antibiotics, a wound vac, and home health care to maintain the wound vac. Toby's wound did not heal, and his routine labs remained abnormal, indicative of ongoing acute kidney injury secondary to the sepsis caused by the burn wound. On April 26, 2019, Toby was admitted to St. Mary's Hospital and his medical records revealed that the treatment of sepsis was "at odds with treating [his] heart failure." On May 13, 2019, Toby was taken by an ambulance to Washington County Hospital, and then to Missouri Baptist Hospital where he was diagnosed with congestive heart failure with a secondary diagnosis of sepsis and right heel ulcer, and MRSA. Two days later Toby became unresponsive, and he was intubated but remained hemodynamically unstable, comatose, and in cardiogenic shock. Toby's ventilator was removed at the recommendations of his doctors. Toby died shortly thereafter at the age of 49.

Plaintiff submitted expert reports from an electrical engineer, forensic pathologist, and human factors expert. Mr. Will Truss, an electrical engineer at Schaefer Engineering, Inc., performed extensive testing and analysis on the electrical heated socks worn by Toby, as well as identical exemplar socks. Mr. Truss found that the Socks were designed with no temperature feedback or regulation device that would prevent the Socks from reaching harmful temperature levels. Further, the Socks worn by Toby consistently reached temperatures in excess of 170 degrees Fahrenheit, with a maximum tested

reading of 176.9 degrees Fahrenheit. The exemplar socks similarly reached temperatures of 150 to 160 degrees Fahrenheit. Mr. Truss's report cited to publications that indicated human skin begins to feel pain at 111 degrees Fahrenheit, with burn injuries occurring at 118 degrees Fahrenheit, and human tissue being instantly destroyed at 162 degrees Fahrenheit.

Mr. Truss opined that the Socks were defectively designed and unreasonable dangerous because they failed to include any temperature feedback or regulation device that would have prevented the Socks from reaching harmful and dangerous temperatures. Mr. Truss provided the following conclusions in his report:

- Mr. Floyd Scott's reported use of the electric heated socks was substantially consistent with the product manual that was supplied with the socks.
- Global Vasion was aware of the potential hazard of skin burns at high temperature with the use of their electric heated socks, prior to this incident.
- A temperature feedback device could have been designed into the Global Vasion electric heated socks that would help to reduce the risk of the hazard of skin burns.
- The Global Vasion electric heated socks contained no feedback or regulation device to sense the temperature of the socks. Without a feedback or regulation device, sock temperatures can reach harmful levels in a matter of minutes.
- The Global Vasion electric heated socks that were distributed by Amazon contained a design defect in that during normal, foreseeable usage, sock temperatures can reach hazardous levels and cause skin burns.

Dr. Eric Peters, a forensic pathologist and former medical examiner, conducted a review of Toby's medical records. Dr. Peters opined that the temperatures reached by the heating element of the Socks, between 153 degrees and 177 degrees Fahrenheit, far

5

exceeded the thresholds of what would cause burns, and was unreasonably dangerous and unsafe.  Dr. Peters also opined that the thermal injury caused by the Socks directly caused or contributed to Toby's death.  He explained that sepsis is not an infection, but rather the body's response to an infection.   Thus, Toby's burn injury from the Socks resulted in multiple infections, sepsis, acute kidney injury, and the exacerbation of congestive heart failure secondary to sepsis. Dr. Peters also opined that Toby's diabetic neuropathy did not preclude Toby from feeling pain from the thermal burns, although it contributed to the initial sensitivity/insensitivity to the Socks' temperature.  Dr. Peters specifically cited Toby's complaints of aching and throbbing pain at the wound cite, and reference to "unbelievable" pain.  Therefore, Dr. Peters concluded that "[w]ithout the burns from the Global Vasion heated socks … Mr. Scott would almost certainly have lived longer and would not have suffered such a painful and premature death."

Dr. Anthony Andre, a board-certified Professional Ergonomist and human factors expert, reported that the Socks were defective and unreasonable dangerous because of their ability to reach unreasonably dangerous temperatures, in addition to their failure to provide any warning advising consumers of the dangerously high temperatures or that the Socks should not be used by people with poor blood circulation, insensitivity to heat, diabetes, neuropathy, or other similar conditions.  Dr. Andre surveyed other electrical heated sock manufacturers and found numerous products with warnings, precautions and contraindications expressing warning that those electric heated socks should not be used by diabetics or people with insensitivity to heat.  Contrary to these warnings, the product page for the Socks worn by Toby affirmatively stated that they were "good for

blood circulation" and for "chronically cold feet." Dr. Andre also opined critically that the default setting on the Socks when turned on was the high heat setting. Dr. Andre provided the following conclusions related to Global Vasion:

- The Global Vasion Electric Heated socks were not safely designed.
- The Global Vasion Electric Heated socks were not properly contraindicated.
- The Global Vasion Electric Heated socks were not properly warned.
- Mr. Scott acted in a reasonable and normal manner and used the product correctly and per the instructions. In fact, he turned the socks off and removed the batteries after only 3 hours of use.
- Global Vasion was aware of certain hazards/risks associated with use of the product and failed to mitigate these risks.
- Global Vasion failed to protect its customers from the hazards/risks associated with use of their product.
- Had Global Vasion designed the product to prevent injury and protect the user, this injury would not have happened.
- Had Global Vasion listed the proper contraindications on the Amazon product page, on the product packaging, and in the instructions, this injury would not have happened.

In addition to these expert reports, Plaintiff also provided detailed evidence of Defendant's knowledge of the inherently dangerous temperatures reached by the Socks, and its failures to take any action to remove the Product from the market, remedy or address the defects, or warn consumers. Kristina Elliott, a risk manager, and corporate representative of Amazon.Com, testified that prior to Ms. Anderson's purchase of the Socks for Toby, Amazon had informed Defendant of other instances where customers reported suffering burn injuries from the Socks, including reports from multiple customers that sustained burns from the same model of Socks purchased by Ms. Anderson for Toby. Indeed, prior to Ms. Anderson's purchase of the Socks, Global

Vasion had been sued in New York for alleged injuries caused by same model of electric heated socks worn by Toby.

Ms. Elliott further testified that Amazon's Product Safety Team contacted Defendant and requested that they take various steps to address burns caused by their Product, and that Defendant acknowledged to Amazon that they knew their Socks caused burn injuries, and stated they would place a "caution card" into the package. The "caution card" was to read, in part:

> CAUTION: IMPROPER USE WILL INJURE THE FOOT . . . Please turn off the heating or change to lowest heating setting after ten minutes using of highest heating setting otherwise it will burn your skin if using it in highest setting all the time. … [N]ot for people with weak sense of heat, especially for ages up 70 and under 15. … Special notice: For the sake of safety, we highly recommend medium or lowest setting.

This "caution card" was not contained in the package or on the Socks used by Toby. Defendant also indicated that it would "redesign the socks, reduce the temperature of the highest setting, and ship the new design socks to warehouse." This was never done.

## Discussion

The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332. Venue is proper under 28 U.S.C. § 1391 because the events giving rise to Plaintiff's claims occurred within the Southern District of Illinois.

Because Defendant is in default, the Court accepts Plaintiff's allegations as true, thereby leaving no question as to liability. See *Dundee Cement Co. v. Howard Pipe & Concrete Prod., Inc.*, 722 F.2d 1319, 1323 (7th Cir. 1983) (While allegations relating to liability of a defendant in default are taken as true, allegations regarding damages

suffered are usually not.).  Thus, the Court now determines the amount to award Plaintiff in both compensatory and punitive damages.

As for Plaintiff's compensatory damages, testimony was presented during the damages hearing by Plaintiff Sandra Scott, Toby's spouse of over 20 years.  Ms. Scott testified extensively of the physical and emotional pain Toby endured in the five months following the burn prior to his death.  This testimony is further supported by the medical records and the opinions of Dr. Eric Peter.  Ms. Scott also testified about how drastically her life was impacted following Toby's injury and death.  Specifically, she detailed Toby's close and loving relationship with herself and his other family members, including Ms. Scott's children and grandchildren.  Ms. Scott further testified about her ongoing mental health treatment for depression following Toby's death.

The Court found Plaintiff's testimony regarding Toby's injuries and death credible, and supported by the record.  Aside from the severe burn and significant physical injuries suffered by Toby, Toby also suffered severe fatigue, social withdrawal, and exhibited significant decline in his cognitive ability and mental behavior during the five-month period following his burn injury, until his death.  Here, there is no equation to quantify the monetary value to adequately represent Plaintiff's loss.  However, based on the totality of records, evidence, and testimony submitted and reviewed by the Court, the Court determines that Plaintiff should receive $6,5000,000.00 in compensatory damages, itemized as follows:

    **I. Economic Damages:**
        a. **Medical Expenses:**

| | |
|---|---|
| Washington County Hospital | $7,905.43 |
| SSM Good Samaritan Mt. Vernon | $30,396.00 |
| Missouri Baptist | $126,973.09 |
| SSM St. Mary's | $48,072.53 |
| Doehring's Pharmacy | $4,022.06 |
| Washington County Ambulance | $3,417.00 |
| | **$220,786.11** |

        b. **Funeral and Burial Expenses:**

| | |
|---|---|
| Styninger Funeral Homes | $5,631.00 |
| Headstone | $2,316.25 |
| | **$7,947.25** |

    **II. Non-Economic Damages:**

| | |
|---|---|
| a. **Loss of Consortium/Society** | $2,000,000.00 |
| b. **Pain and Suffering** (Survival Act) | $500,000.00 |
| c. **Loss of Normal Life** (Survival Act) | $500,000.00 |
| d. **Disability experienced** (Survival Act) | $500,000.00 |
| e. **Disfigurement** (Survival Act) | $500,000.00 |
| f. **Shortened life expectancy** (Survival Act) | $500,000.00 |
| g. **Emotional Distress** | $2,000,000.00 |
| | **$6,500,000.00** |

**Total Compensatory Damages:**          **$6,728,733.36**

Plaintiff is further entitled to prejudgment interest on all damages, excluding punitive damages, sanctions, attorneys' fees, and costs, accruing from the effective date of the amendatory Act (July 1, 2021) through entry of an award at the rate of 6% per annum. *See* 735 Ill. Comp. Stat. Ann 5/2-1303(c). Prejudgment interest on the compensatory damages award of **$6,728,733.36**, through the date of the November 28, 2023 hearing, totals **$972,301.97**.

In addition to compensatory damages, Plaintiff also seeks an award against Defendant for punitive damages. As the Court found an award of compensatory

damages proper, it will consider whether an award of punitive damages must also be given. Although awarding punitive damages is generally disfavored and not allowed for a finding of merely ordinary negligence, such award is appropriate when the defendant is found to have acted with "malice or an evil motive or … with a reckless indifference toward the rights of others." *Parks v. Wells Fargo Home Mortg., Inc.*, 398 F.3d 937 (7th Cir. 2005). The purpose of a punitive damages award is to dispense a pecuniary punishment to the liable defendant and to deter future conduct of a similar nature. *See Farfaras v. Citizens Bank & Tr. of Chicago*, 433 F.3d 558, 567 (7th Cir. 2006).

Unquestionably, an award of punitive damages is appropriate in this case. The evidence in the record reveals that its Product caused severe injuries and lacked adequate warnings, yet Defendant continues to advertise and promote the Product as being good for people with poor blood circulation and chronically cold feet, both of which are medical conditions common among individuals with peripheral neuropathy, like Toby, who can be seriously injured by the Socks' dangerously high temperatures. This finding is supported by the testimony of Amazon's corporate representative, which reveals that Global Vasion was not only informed about safety concerns and injuries resulting from the Socks, but that Global Vasion affirmatively represented it would redesign the Product and/or supply additional warnings for the Product, yet failed to do so. This knowledge alone signifies reckless indifference towards people with medical conditions who were not only targeted consumers for the Socks, but had heightened susceptibility to suffering severe injuries from the use of the Socks, further reflecting the egregiousness, malicious intent, and severity of Global Vasion's actions. Further, it is no surprise that Plaintiff and

11

Toby's relatives experienced their own emotional distress from watching Toby's significant decline and distress following what was supposed to be a thoughtful gift to help treat Toby's preexisting medical conditions. Simply, Global Vasion's indifference to the significant pain and suffering its Product was causing to individuals like Toby, all to turn a profit, is cruel.

Not only does the Court feel Defendant should be punished for its actions, but it is imperative to deter future conduct of a similar nature, and particularly Defendant's blatant attempt to avoid all responsibility for the harm caused by its Product. The Court finds it repugnant that Defendant would avail itself to this country's stream of commerce and then refuse to appear and take any responsibility for the harm its Product caused. As the record reveals, Defendant initially appeared in this case, before requesting its attorneys to withdraw from the litigation (Docs. 35, 41 60). Once Defendant's attorneys withdrew, Defendant never appeared in the case again. It further dissolved itself as a California corporation shortly after the filing of Plaintiff's lawsuit, effectively disappearing from the United States (Doc. 67-2).

Plaintiff offered credible evidence of Global Vasion's United States based sales figures, revealing that Global Vasion received almost $5 million in sales for its Socks from December 2014 through March 2021. Plaintiff also credibly showed that Global Vasion continues to maintain a website and still sells its Socks with the same representations and with no warnings. Accordingly, Defendant's actions in exploiting the United States consumer base by continuing to sell its dangerous Product, without taking any responsibility for the subsequent harm caused by that Product, is repugnant and worthy

of an award of punitive damages. The Court therefore finds Plaintiff should receive an award of $2,000,000.00 in punitive damages.

## Conclusion

Pursuant to Fed. R. Civ. P. 55(B)(2), a judgment of default shall be entered against Defendant Global Vasion, Inc. for its liability to Plaintiff in the amount of $6,728,733.36 in compensatory damages, plus prejudgment interest at the rate of 6% per annum, in the amount of $972,301.97, and $2,000,000.00 in punitive damages, for a total judgment amount of **$9,701,035.33.**

The Clerk of Court is **DIRECTED** to enter judgment accordingly and to close this case.

**SO ORDERED.**

Dated: December 14, 2023

---

DAVID W. DUGAN
United States District Judge